## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **MICHAEL HILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **SYNGENTA SEEDS, INC.,** | ) | |
| 11055 Wayzata Blvd. | ) | |
| Minnetonka, Minnesota, 55305 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **SYNGENTA AG,** | ) | |
| Schwarzwaldallee 215 | ) | |
| Basel, Basel-Stadt, 4058, Switzerland | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Michael Hill ("Plaintiff"), for his Complaint against defendants Syngenta Seeds, Inc. and Syngenta AG (collectively "Syngenta") alleges:

### NATURE OF THE CASE

1. As a result of Syngenta's refusal to wait for its new biotech traits implanted in genetically modified corn seed to be approved for human and/or animal consumption by major U.S. export partners, and the subsequent and foreseeable discovery of this unapproved trait in exports to China, Syngenta has caused damages to U.S. farmers, grain handlers, and exporters. Syngenta's conduct in marketing, distributing, and selling unapproved corn seed violates the legal standards of the marketplace because the primary market risk falls on U.S. farmers, grain handlers, and exporters, not on Syngenta. This suit seeks to recover the damages Syngenta's conduct caused Plaintiff.

1

**OVERVIEW**

2. U.S. corn farmers have long been at the mercy of corporate biotechnology giants in their battle to sell genetically modified seed. Syngenta marketed, distributed, and sold genetically modified corn with unapproved biotech traits in disregard of the rights of farmers and the impact its actions would have on the U.S. corn market. As was inevitable, Syngenta's genetically modified corn contaminated the U.S. corn supply, and, China, the fastest growing export market for U.S. corn, discovered the contamination and, in February 2014, banned the import of all U.S. corn. Exports of U.S. corn are down 85% in 2014 compared to 2013 as a result. Given the laws of supply and demand, prices are down as well. Plaintiff has been harmed by Syngenta's decision to prematurely market, distribute, and sell genetically modified corn seed that is not approved in major U.S. export markets.

3. Beginning with the 2011 growing season, Syngenta began marketing, distributing, and selling a variety of new hybrid corn seeds sold under the tradename Agrisure® Viptera™, which contains a new genetically modified trait known as "MIR 162." Syngenta claims that its Viptera variety of seeds increase yields due to improved resistance to insects. Despite knowing the rest of the world was not as eager as the United States to adopt bio-engineered food or feed, Syngenta began selling Viptera in the United States before other countries decided whether to approve it.

4. As Syngenta should have known would happen, the European Union, China, and most other countries needed time to determine whether to approve it for animal and/or human consumption. While many countries approved Viptera, over the course of the next several years some countries, including China, did not. As a result, many grain elevators, which are the initial market for U.S. farmers, refused to accept Viptera corn.

5. In 2013, China discovered Viptera corn in shipments of what was supposed to be non-

Viptera corn from the United States. China has adopted a "zero tolerance" policy with respect to unapproved genetic traits. As a result, after initially rejecting just the shipments of corn that tested positive for Viptera, China banned the import of all U.S. corn and canceled its large purchase orders for U.S. corn.

6. In 2014, despite knowing from its experience with Viptera that China and other countries not only had not approved its genetically modified corn but were not likely to do so anytime soon, Syngenta began marketing yet another genetically modified corn seed named Agrisure® Duracade™ ("Duracade"). Syngenta's two Duracade varieties are hybrid combinations of various genetically modified traits, one of which contains Viptera. Syngenta began marketing Duracade before China, all 28 states of the European Union, Brazil, Switzerland (Syngenta's home country), Colombia, Egypt, India, the Philippines, the Russian Federation, Indonesia, Thailand, Singapore, Kazakhstan, Belarus, and Turkey had approved Duracade for human or animal consumption.

7. The loss of a large purchaser of U.S. corn like China as a result of the Viptera contamination has had a sudden and calamitous impact the U.S. corn market.

PARTIES

*Plaintiff*

8. Plaintiff Michael Hill is a citizen of the State of Missouri. Plaintiff grew corn in Randolph County, Missouri, in the 2013-2014 growing season. At no time did Plaintiff purchase either Viptera or Duracade corn seed, nor has he ever knowingly grown Viptera or Duracade corn.

*Defendants*

9. Syngenta Seeds, Inc. is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. Syngenta develops and produces agricultural seeds, including, but not

limited to, corn and soybean seeds, and in particular Viptera and Duracade. Syngenta Seeds conducts business throughout the United States, including in Missouri. Specifically, Syngenta Seeds sells its agricultural seeds to growers either directly or through a network of dealers and distributors.

10. Syngenta AG is a Swiss company headquartered in Basel, Switzerland. It is the world's largest crop chemicals company. Syngenta AG also develops and produces genetically modified corn and soybean seeds, including Viptera and Duracade corn seeds. Syngenta AG conducts business throughout the United States, including in Missouri.

11. At all relevant times, Syngenta Seeds, Inc. and Syngenta AG (collectively "Syngenta") have been unified in interest and ownership. The entities are alter-egos of each other, and they have collectively been run as a single business enterprise.

12. As a result of Syngenta's refusal to wait for its new biotech trait implanted in genetically modified corn seed to be approved for human and/or animal consumption by major U.S. export partners, and the subsequent and foreseeable discovery of this unapproved trait in exports to China, Syngenta has damaged Plaintiff.

## JURISDICTION AND VENUE

13. Personal jurisdiction is proper over Syngenta because both Syngenta entities have minimum contacts with Missouri to satisfy traditional notions of due process by transacting business, entering into contracts, committing tortious acts, and maintaining an office in this State.

14. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a) and 1367.

15. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Syngenta is a resident of this State for venue purposes and a substantial portion of the underlying transactions

and events complained of herein occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District. Syngenta has received substantial compensation from such transactions and business activity in this District, including as the result of purchases of Viptera, Duracade and other varieties of Syngenta corn seed from retail locations in Missouri. Further, Syngenta conducts interstate trade and commerce within this District.

## FACTUAL ALLEGATIONS

### The Market for United States Corn

16.  The United States is the world's largest producer and exporter of corn. There are more acres of farmland growing corn each year than any other crop in the United States. Over 13 billion bushels of corn–over 35% of the world's corn production–are grown annually in the United States on roughly 95 million acres of farmland.

17.  Roughly 20% of the over 13 billion bushels of corn grown each year is sold for export to foreign countries. The export of U.S. corn generated close to $18 billion in revenues during the 2011-2012 growing season - making it the largest and most important cash crop grown in the United States.

18.  Historically China was not a large importer of U.S. corn, but in each of the last five years it has been rapidly increasing its purchase of U.S. corn to such an extent that it became a major export market for U.S. corn in 2011. Given the size of the Chinese market, the laws of supply and demand drove the price of U.S. corn higher. In the 2011-2012 marketing year, 203 million bushels out of 1.543 billion total exported U.S. corn bushels were exported to China. Importantly, China has long been resistant to new genetically modified crops, and in fact requires new genetically modified seeds to be planted in China and generate crops for testing before a

new genetically modified seed variety is even eligible for import approval into China.

*Corn Farming in Missouri*

19. According to the United States Department of Agriculture's National Agricultural Statistics Service, Missouri ranks second in the nation in the number of farms, with just under 100,000 farms located in the state. These farms produce more than $9 billion in agricultural products, split fairly evenly between crop and livestock.

20. In 2013, Missouri farmers planted 3.35 million acres of corn, ranking ninth in the country and harvested over 435 million bushels, ranking tenth.

*Syngenta's Genetically Modified Corn*

21. Syngenta's Viptera and Duracade varieties of corn seed each have a genetically modified protein that allegedly makes the corn plant more resistant to insects and other pests. As bio-engineered products, Syngenta's genetically modified corn is subject to regulatory approval prior to commercialization.

22. Other countries take varying periods of time to review and approve or disapprove of new genetically modified grains before they can be imported into that country. China's regulatory process begins *after* regulatory approval of the seed in the exporting country, and typically takes at least two years for a regulatory decision to be made.

23. Viptera is a variety of yellow corn that has been genetically altered to contain the "Vip3A" insecticidal protein that is supposed to help corn crops resist various corn pests. In 2010, the United States Environmental Protection Agency granted registration approval for genetic trait stacks including Syngenta's Agrisure Viptera gene.

24. At times during 2014, numerous countries, including China, Venezuela, South Korea, Saudi Arabia, Cuba, and Jamaica, collectively comprising as much as 25% of the U.S. corn

export market, had refused to approve Viptera corn as fit for human consumption.

25. Nevertheless, promptly after receiving approval for Viptera in the U.S., Syngenta began marketing, distributing, and selling its Viptera variety corn seeds—even though it had not received approval from other countries that purchase U.S. corn and on whose purchases the market price for corn depends. Knowing that contamination of Viptera corn with the rest of the U.S. corn supply was inevitable, Syngenta nevertheless gambled U.S. farmers' livelihood on approval of Viptera by the major corn importing countries. Syngenta projected that sales of Viptera would ultimately exceed 20% of the corn seed market.

26. Syngenta's Duracade varieties also express a new Bt Cry protein, eCry3.1Ab, that was designed to genetically help control problems with corn rootworm. This new protein had never been used commercially before Syngenta's introduction of its Duracade varieties. The EPA granted registration approval of Syngenta's Agrisure Duracade trait in October 2012.

27. Despite launching Duracade in the United States in 2014, Syngenta Canada Inc. announced that it would not sell Duracade varieties in Canada for planting and that any seed containing Duracade shipped to Canada "cannot be sold" and that "arrangements for immediate returns will be made." Syngenta Canada's announcement noted the lack of regulatory import approvals in other countries, particularly China and the European Union. "Accordingly, we want to ensure the acceptance of any trait technology grown in Canada meets end market destination requirements."

***Different Varieties of Corn Cannot Be Kept Segregated***

28. Corn replicates by cross-pollination from one plant to another. Pollen from corn stalks "drift" over considerable distances and cross-breeds with other corn plants.

29. The U.S. corn marketing system is commodity-based and gathers, commingles, and

ships corn from hundreds of thousands of farms through local, regional, and terminal grain elevators. With few exceptions, therefore, the many varieties of corn harvested in the United States are not segregated in storage and transportation. Grain elevators and other corn storage and transportation facilities are generally not equipped to test and segregate corn varieties, and to undertake testing and segregation at these facilities causes disruption and expense.

30. In marketing and selling Viptera in the United States, Syngenta knew that it was impossible to completely isolate Viptera corn from other varieties of corn and that Viptera corn would inevitably cross-pollinate with other corn plants. Syngenta therefore knew, or should have known, that unless strict precautionary measures could be implemented at all levels – from the farm level from planting through the marketing chain – given the nature of the U.S. grain handling system, Viptera would contaminate other U.S. corn crops, infiltrate the general U.S. corn supply, and therefore cause problems in foreign markets that imported U.S. corn but had not approved Viptera corn.

31. The market reaction promptly proved the foreseeability of Viptera contamination, and the harm it would cause. In the spring of 2010, before Syngenta obtained import approval for Viptera corn from Japan and Korea and before it began selling Viptera corn seed commercially, Bunge North America, Inc., owner and operator of approximately 71 grain and milling facilities and at least 66 grain elevators, adopted a policy stating it would not accept delivery of Viptera corn during the 2010 growing season.

32. After briefly lifting this policy when Syngenta received import approval from Japan and Korea, Bunge again announced in the summer of 2011 that it would refuse to accept delivery of Viptera corn. Bunge's second refusal to accept Viptera corn was based on Syngenta's failure to obtain regulatory approval from major export partners, specifically China and the European

Union.

33. In response, Syngenta sued Bunge on August 22, 2011 in the United States District Court for the Northern District of Iowa, and sought a preliminary injunction requiring Bunge to accept Viptera corn. After hearing evidence at a preliminary injunction hearing, the court found that it was not commercially reasonable or feasible for Bunge to segregate Viptera corn and thus denied Syngenta's request for a preliminary injunction. The court further found that injunctive relief would improperly impose costs on Bunge to segregate its corn, and Bunge should not bear the costs in connection with Syngenta's unilateral decision to prematurely launch Viptera. The court found that the balance of equities weighed against injunctive relief because Syngenta decided to commercialize Viptera corn knowing it did not have import approvals from China and other countries. Lastly, the court found that the public interest strongly favors allocating the risks to Syngenta the costs resulting from its unilateral decision to prematurely introduce a new transgenic grain into the commercial market. *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, 820 F.Supp.2d 953 (S.D. Iowa 2011).

34. Other major grain elevators followed Bunge's lead and also refused to accept delivery of Viptera corn. In September 2011, Cargill adopted a policy refusing to accept Viptera corn. Around the same time, ADM and LouisDreyfus Commodities also refused to accept delivery of Viptera corn. These announcements from the largest grain elevators have been followed by announcements from numerous smaller grain elevators, including Trupointe Cooperative, Inc. and Guardian Energy, LLC.


***The Harm Caused by Syngenta to U.S. Corn Farmers***

35. In November 2013, China began rejecting shipments of U.S. corn after inspection tests

revealed the presence of Syngenta's unapproved Viptera corn. In November and December 2013 alone, China rejected more than 665,000 metric tons of U.S. corn shipments due to the presence of Viptera. The Chinese General Administration of Quality Supervision, Inspection, and Quarantine began inspecting "every single shipment" of U.S. corn to detect Viptera. If any Viptera was detected, China rejected the entire shipment because of its "zero-tolerance" policy for unapproved imports, which both China and the United States have adopted.

36. China has been the fastest growing market for U.S. corn in recent years. Before the 2013-2014 marketing year for corn, the USDA projected that China would import approximately 7 million metric tons of U.S. corn. Instead, because of Viptera contamination, China has only imported 1.23 million metric tons. The USDA also projected that China would become the largest importer of U.S. corn by 2020 and would increase its import of corn to 22 million metric tons by 2023, accounting for nearly half of the projected growth in world corn trade.

37. In December 2013, China decided to not only reject shipments of U.S. corn, but also rejected approximately 2,000 tons of U.S. Distiller's Dried Grains with solubles ("DDGs"), which is produced when corn is processed into ethanol, and is used as animal feed. Over the next three weeks, the price of DDGs fell by over one-third, from \$325/ton to \$218/ton at the Gulf export market. On June 9, 2014, China cancelled all import licenses to import U.S. DDGs.

38. Moreover, before China's rejection of U.S. corn and DDGs began, the U.S. Department of Agriculture forecast that China would triple its import of DDGs to seven million tons. Indeed, China had rapidly increased its import of U.S. DDGs since 2008, and particularly in the last two years. Overall, roughly 20% of all U.S. DDGs is exported abroad, with China accounting for almost two-thirds of all U.S. exports of DDGs.

39. Because of China's rejection of Syngenta's Viptera corn, U.S. exports of corn are down

roughly 85% from last year. The loss of large export markets for U.S. corn and DDGs has resulted in reduced prices for all U.S. corn.

***The Market Has Widely Criticized Syngenta's Selfish Behavior***

40. The National Grain and Feed Association ("NGFA") and the North American Export Grain Association ("NAEGA") are two of the largest industry organizations promoting U.S. grain producers and exporters. Both organizations seek to facilitate trade and provide for regulatory compliance while improving the environment for crop production.

41. On January 22, 2014, the NGFA and NAEGA sent a joint letter to Syngenta asking it to immediately stop selling Viptera and Duracade until such time as China and other U.S. export markets granted regulatory approval to one or both varieties because of the harm that Syngenta's commercialization of these two varieties had caused to U.S. corn farmers. In their joint letter, the NGFA and NAEGA stated that they "are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers—as well as the U.S.'s reputation to meet its customers' needs—that has resulted from Syngenta's current approach to stewardship of Viptera." The NGFA and NAEGA informed Syngenta that launching Duracade would risk repeating and extending the damage that Syngenta had already caused by selling Viptera. (Ex. 1).

42. As the letter further explained, "[a]s a matter of policy, NGFA and NAEGA have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/ authorizations for import in foreign markets before such traits are commercialized in the United States. Individual grain handler, processor, service provider and exporter member companies of our Associations represent further system-wide support and advocacy for this policy." (*Id.*).

11

43. Echoing the sentiments of the Plaintiff here, the NGFA and NAEGA stressed to Syngenta that "U.S. farmers … depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization." (*Id*.).

44. Syngenta rejected all pleas to stop selling Viptera and Duracade corn seed.

45. On February 13, 2014, Bunge announced publicly that it would reject all shipments of corn containing Syngenta's Duracade variety until Duracade was approved by China. The next day, on February 14, 2014, Cargill, the top exporter of U.S. grains and oilseeds, announced that it would also reject all shipments of corn containing the Duracade variety.

46. On February 21, 2014, Archer Daniels Midland Co. ("ADM"), another large grain elevator, likewise refused to accept shipments of Duracade corn. "ADM and most of the major US grain exporters believe that seed companies like Syngenta should market their products responsibly. Commercializing seed products that are not approved in all of the major export markets is not responsible." (Ex. 2).

47. In April 2014, the NGFA issued two economic analyses that conservatively calculated the combined harm caused by Syngenta to farmers, grain handlers, and exporters, as ranging between $1 billion and $2.9 billion, depending on how the harm is measured. Further, given Syngenta's launch of Duracade, the NGFA estimated that the total harm to the grains sector for the 2014-15 marketing year could be even higher— and as high as $3.4 billion. In these economic analyses, the NGFA stressed its support for agricultural biotechnology developments, but not the commercialization of such crop biotechnology before securing import approvals from major U.S. export markets. (Exs. 3, 4).

48. As aptly stated by the NGFA, "[r]egaining and maintaining access to the Chinese import

market, as well as preserving access to other U.S. export markets, is critically important to the short- and long-term prospects of U.S. agriculture. These export markets are key drivers of producer profitability, current and future economic growth for U.S. agriculture, and achieving global food security." (Ex. 3, p.2).

49. Prompted by the harm that Syngenta has caused to the U.S. corn market, the NAEGA, which represents the big grain companies, submitted its position to the U.S. Department of Agriculture calling on all seed makers, including Syngenta, to "commit to fully bear the risks and liabilities associated with any commercialization or launch" of new genetically modified seeds. The NAEGA further noted that its members "object to commercialization prior to major market approvals unless the technology provider assumes appropriate responsibility for economic losses associated with such commercialization." While the NAEGA's statements were intended to apply generally, it specifically noted that "[o]ur recent experiences in significant disruptions in U.S.-China corn trade, exemplifies both how impactful these commercialization decisions can be on U.S. agriculture and how the financial risks and damage are not broadly shared across the value chain. A unilateral decision to commercialize ahead of major market approvals causes significant damage to U.S. agriculture and short and longer term opportunities to grow and serve our global markets." (Ex. 5).

50. Plaintiff brings this case with the same request—that Syngenta fully bear the risks and the liabilities imposed on Plaintiff associated with its launch of Viptera and Duracade corn seed, including, but not limited to diminished prices for U.S corn resulting from loss of export and domestic markets for that corn and through the contamination of the entire corn farming and production chain, including, but not necessarily limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment.

*Syngenta's Late and Ineffective Precautions*

51. Instead of taking responsibility for the damage it has caused and is still causing with the premature commercialization of Viptera, Syngenta has blamed others and refuses to compensate producers for the losses they have suffered.

52. Further, Syngenta has refused to delay its commercialization of Duracade despite knowing that the premature launch of Duracade is likely to cause similar damage to corn markets as Viptera. Instead, Syngenta has sought to transfer the burden of its premature launch of Duracade onto the farmers who suffered the harm from Viptera.

53. Now, when Syngenta sells Duracade corn seed to farmers, it requires them to sign a "Syngenta Stewardship Agreement" under which the farmer must agree to feed the harvest to livestock or poultry on the farm or sell it to a grain elevator that does not export to China or the European Union.

54. Acknowledging the danger of cross-contamination, Syngenta claims to advise the farmers that purchase Duracade seed to harvest it separately from other varieties, store it in separate bins, and surround Duracade corn fields with "buffer" rows of another variety.

55. Because much of the market refused to purchase Viptera harvested corn for fear of the precise harm that eventually resulted, Syngenta arranged for Gavilon Grain, LLC, a commodity management firm, to purchase all corn harvested from Duracade seed. Syngenta's contractual arrangement with Gavilon proves it is fully aware of the harm that Viptera has done to the market and of the harm that Duracade may well do. Nevertheless, Syngenta's arrangement is designed only to protect those farmers who purchase Duracade seed, and not the producers who refuse to do so but are harmed by Syngenta's premature launch of genetically modified seed varieties that are not approved in major export markets.

56. Farmers like Plaintiff who have not purchased or harvested Viptera or Duracade corn have sustained damage to their property as a result of Syngenta's wrongful conduct, through the contamination of the entire corn fanning and production chain, including, but not necessarily limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment.

57. The harm caused by Syngenta to non-Viptera and non-Duracade farmers is continuing in nature and places them at risk for further damages caused by the cross-pollination and contamination of their corn crops with Viptera or Duracade and from the continued decrease in price for U.S. corn from the loss of demand from export partners.

58. At all times relevant to this suit neither Viptera nor Duracade was a biological control organism, plant pest, or noxious weed and thus are not governed by the Plant Protection Act ("PPA"), 7 U.S.C. § 7711 et seq. Plaintiff does not assert, and expressly disclaims, any claim against Syngenta for violation of the PPA.

59. Plaintiff does not assert, and expressly disclaims, any claim based on a misrepresentation or omission regarding the labeling of Syngenta's product. Plaintiff does not seek to impose or continue in effect any requirements for labeling or packaging of Syngenta's products.

### COUNT I: NEGLIGENCE

60. Plaintiff realleges the above paragraphs as though fully set forth herein.

61. Syngenta's acts or omissions, as described above, constitute negligence, negligence *per se*, or both.

62. As a product developer and manufacturer, Syngenta had a duty to refrain from selling and distributing Viptera in a manner that would foreseeably cause harm to the Plaintiff, to use ordinary care in its commercialization of Viptera, and to protect Plaintiff from an unreasonable

risk of harm.

63. Syngenta breached these duties by failing to exercise reasonable care to prevent the foreseeable contamination of the U.S. corn supply through cross-pollination and commingling that would naturally result from the premature sale and distribution of Viptera as outlined herein.

64. Syngenta's breach is the direct and proximate cause of the damage suffered by Plaintiff.

65. The rejection by China of U.S. corn could not have occurred without Syngenta's negligence in prematurely releasing Viptera corn seed without prior approval of major export partners because the commercialization of Viptera was solely under its management and control. Syngenta made the decision to commercialize Viptera knowing that it would likely contaminate the U.S. corn supply. Viptera in fact contaminated the U.S. corn supply, which could not have occurred without Syngenta's negligence. Syngenta had exclusive control over the commercialization of Viptera and this unapproved genetically modified trait could not have contaminated the U.S. corn supply without a lack of proper care.

66. Plaintiff suffered injury and property damage by the sale and distribution of Viptera by Syngenta as outlined herein and seek compensatory damages. Plaintiff further seeks punitive damages as a result of Syngenta's reckless and willful conduct, and all costs and fees allowed by law.

## COUNT II: RES IPSA LOQUITOR

67. Plaintiff realleges the above paragraphs as though fully set forth herein.

68. The rejection by China of U.S. corn could not have occurred without Syngenta's negligence in prematurely releasing Viptera corn seed without prior approval of major export partners. Syngenta made the decision to commercialize Viptera knowing that it would likely contaminate the U.S. corn supply. Viptera in fact contaminated the U.S. corn supply, which

could not have occurred without Syngenta's negligence. Syngenta had exclusive control over the commercialization of Viptera and this unapproved genetically modified trait could not have contaminated the U.S. corn supply without a lack of proper care.

69. Plaintiff was damaged as a proximate result of Syngenta's negligence.

## COUNT III: PUBLIC NUISANCE

70. Plaintiff realleges the above paragraphs as though fully set forth herein.

71. Syngenta has created a public nuisance by unlawfully causing widespread contamination of corn in the United States with Viptera corn, which constitutes an unreasonable and substantial interference with public rights, public health, public comfort, and public convenience.

72. This substantial interference is imposed on the community at large and on a considerable and diverse number of persons. It raises from: (a) the sale and distribution of Viptera corn without approval from China and/or the European Union; (b) the sale and distribution of Viptera with the knowledge that it would contaminate non-Viptera corn by cross-pollination and commingling; and (c) the sale and distribution of Viptera with the knowledge that Viptera would likely contaminate the human food supply.

73. Plaintiff suffered damage because of the drop in the price of corn and the cross-contamination or potential of cross-contamination with Plaintiff's non-Viptera corn—each of which is a direct result of Sygenta's actions described in this Complaint.

74. Plaintiff seeks compensatory damages and also seeks punitive damages as a result of Syngenta's reckless and willful conduct, and all costs and fees as allowed by law.

## COUNT IV: PRIVATE NUISANCE

75. Plaintiff realleges the above paragraphs as though fully set forth herein.

76. Syngenta has created a private nuisance through the sale and distribution of Viptera corn.

17

Syngenta licensed, sold, and distributed Viptera corn without regard for the cross-pollination that results when Viptera corn pollen drifts to neighboring, non-Viptera fields. As a result, the entire U.S. corn farming and production chain, including, but not limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment of Plaintiff are contaminated with Viptera.

77. Syngenta's acts or omissions interfered with the use and enjoyment of Plaintiff's rights, comfort, and convenience.

78. The interference with the use and enjoyment of the property caused by Syngenta is substantial, unreasonable, and ongoing and is imposed not just on Plaintiff but on a considerable number of individuals and entities. Plaintiff, though, has suffered injuries distinct from the general public in that Plaintiff has suffered and continue to suffer business losses in the form of reduced or restricted demand for Plaintiff's crops, reduced prices for Plaintiff's crops, and diminution of value of Plaintiff's corn harvesting.

79. Syngenta's acts and omissions are the direct and proximate cause of the damages suffered by Plaintiff.

### COUNT V: STRICT LIABILITY

80. Plaintiff realleges the above paragraphs as though fully set forth herein.

81. Syngenta developed and distributed Viptera corn seed, a defective and unreasonably dangerous product that, when used as anticipated, produced corn that had not been approved for human consumption by China and the European Union.

82. The sale and distribution of Viptera corn has resulted in the contamination of the U.S. grain production and handling system, causing export markets to restrict, or ban altogether, importation of U.S. corn. Exercise of reasonable care could not have eliminated the risk of such

contamination and resulting injuries.

83. Given the structure and operation of the U.S. grain production and handling system, Syngenta's sale and distribution of Viptera corn was improper.

84. Any benefit derived from the cultivation of Viptera corn is greatly outweighed by the harm resulting from Viptera contamination of the U.S. corn supply.

85. Plaintiff seeks compensatory damages and also seek punitive damages as a result of Syngenta's reckless and willful conduct, and all costs and fees as allowed by law.

COUNT VI: VIOLATIONS OF RSMO. § 537.353

86. Plaintiff realleges the above paragraphs as though fully set forth herein.

87. Syngenta developed and knowingly distributed Viptera and/or Duracade corn seed that had not been approved for import by China and certain other import markets, resulting in the contamination of the U.S. grain production and handling system, causing export markets to restrict, or ban altogether, importation of U.S. corn.

88. Syngenta knew or should have known of that a consequence of distributing Viptera and/or Duracade at the time and in the manner it did would be the loss of a major export market such as China, which would damage all domestic growers including Plaintiff.

89. Syngenta thereby knowingly damaged field crop products grown by Plaintiff for personal or commercial purposes and shall be liable for double damages pursuant to RSMo. 537.353.1, plus court costs and reasonable attorneys fees.

90. Alternatively, Syngenta negligently damaged field crop products grown by Plaintiff for personal or commercial purposes, and is therefore liable to Plaintiff for compensatory damages under RSMo. 537.353.2, plus court costs and reasonable attorneys fees.

## COUNT VII: VIOLATIONS OF THE LANHAM ACT – 15 U.S.C. § 1125(a)(1)(B)

91. Plaintiff realleges the above paragraphs as though fully set forth herein.

92. Syngenta used and/or continues to use in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which were likely to cause and/or did cause confusion and mistake, including but not limited to statements on the Internet, statements on its "Plant With Confidence" fact sheet, in its frequently asked questions, during quarterly conference calls, and incorporated into Syngenta's forms, which represented that Viptera corn is or would imminently be approved for import into China.  Such statements were materially false and were likely to cause and did cause confusion and mistake as to the nature, characteristics, and qualities of Viptera, and which caused damages to Plaintiff.

93. Syngenta's representations deceived farmers and other purchasers and sellers of corn as to the approval of Syngenta's goods (specifically, Viptera and Duracade corn), from foreign regulatory authorities, including China.

94. Syngenta's false and misleading statements were made as an advertisement for Viptera corn, and specifically referred to Viptera.  Syngenta's economic motivation to make such statements was to sell Viptera and induce certain growers to grow Viptera and other purchasers to purchase Viptera, without regard to good stewardship practices, all of which caused and contributed to cause China to refuse to import corn from the United States.

95. Plaintiff was damaged as a result of Syngenta's misleading misrepresentations as described herein.

96. Syngenta's use of false descriptions and false representations in interstate commerce violated section 43(a) of the Lanham Act.

**REQUEST FOR RELIEF**

**WHEREFORE,** Plaintiff requests that the Court enter judgment as follows:

    a.  That the Court adjudge and decree that Syngenta Seeds, Inc. and Syngenta AG are liable to Plaintiff for:

        i.  Negligence*;*

        ii.  Negligence *per se*;

        iii. Public Nuisance;

        iv.  Private Nuisance;

        v.  Strict liability;

        vi. Violations of RSMo. § 537.353; and

        vii. The Lanham Act, 15 U.S.C.§ 1125(a)(1)(B).

    b.  That the Court order Syngenta:

        i.  To pay compensatory and consequential damages;

        ii.  To pay exemplary and punitive damages;

        iii.  To pay the costs of this action, including attorneys' fees and expenses;

        iv.  To pay pre- and post-judgment interest; and

        v.  Such other and additional relief as the Court deems equitable, appropriate, and just.

## **JURY DEMAND**

Plaintiff demands a jury trial on all claims so triable.

Dated: December 30, 2014

Respectfully Submitted,


By:*/s/ Thomas J. Preuss*      

Thomas P. Cartmell
Eric D. Barton
Tyler W. Hudson
Thomas J. Preuss
Christopher L. Schnieders
WAGSTAFF & CARTMELL LLP
4740 Grand Ave. Ste. 300
Kansas City, MO 64112
Telephone:  (816) 701-1100
Facsimile:   (816) 531-2372

**ATTORNEYS FOR PLAINTIFF**